UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CR-19-03289 |
| vs. | ) | |
| | ) | Tucson, Arizona |
| Francisco Dario Mora, | ) | May 10, 2021 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS**
**SENTENCING**

BEFORE THE HONORABLE SCOTT H. RASH
UNITED STATES DISTRICT JUDGE
TUCSON, ARIZONA

Anni Bryan, RDR, CRR
Official Court Reporter
(520)205-4268

Proceedings reported by realtime court reporter
Transcript prepared by computer-aided transcription

## A P P E A R A N C E S

For the Government:

Serra Tsethlikai
United States Attorneys Office
405 West Congress Street, Suite 4800
Tucson, Arizona 85701

For the Defendant:

Greta Vietor
Federal Public Defenders Office
405 West Congress Street, Suite 501
Tucson, Arizona 85701

**P R O C E E D I N G S**

* * *

THE CLERK: In criminal matter 19-3289, United States of America versus Francisco Dario Mora, on for sentencing.

THE COURT: Appearances, please.

MS. TSETHLIKAI: Good morning, Your Honor.

Serra Tsethlikai for the United States.

MS. VIETOR: Good morning, Your Honor.

Greta Vietor for Francisco Dario Mora. He is appearing by video from CCA Florence. His mother and other family members are in the courtroom as well.

THE COURT: Good morning, Mr. Mora.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Actually have two counsel in my courtroom. That hasn't happened for a long time. Good to see you both.

Ms. Vietor, have you reviewed with your client his right to be physically present here in the courtroom?

MS. VIETOR: Yes, I have, Your Honor.

THE COURT: And do you believe it's in his best interest to proceed with this hearing even though your client cannot be physically present?

MS. VIETOR: I do, Your Honor.

THE COURT: Mr. Mora, do you understand that you have the right to be physically present here in the courtroom?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Pursuant to the CARES act, we can proceed by videoconference if you're willing to waive your right to be present.

Do you wish to waive that right, sir, and proceed with this hearing by videoconference?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Court finds the defendant knowingly, voluntarily and intelligently waives his right to personally appear and has agreed to proceed by videoconferencing.

The Court finds it appropriate for the case to proceed as scheduled because any further delay would seriously harm the interests of justice by contributing to the growing backlog of criminal matters caused by the pandemic.

Ms. Vietor, have you reviewed the presentence report with your client?

MS. VIETOR: Yes, I have, Your Honor.

THE COURT: I know you filed an objection to the presentence report. I have reviewed that and the State's response thereto and probation's input on it.

Do you have any further argument, Ms. Vietor?

MS. VIETOR: Yes, I do. May I sit while I address the Court, or would you like me to --

THE COURT: You're free to sit or you're welcome to come up to the podium, whatever is more comfortable for you.

MS. VIETOR: Thank you.

Yes, Your Honor, I did file an objection to the presentence report, asking the Court to find that the two-level enhancement under 3B1.1 for organizer/leader is not appropriate in this case.

Your Honor, Mr. Mora and his co-defendant, Mr. Sevilla, were both working together. They were both purchasing firearms. They were both going into the firearms FFLs in different locations, sometimes together. They were both traveling, at times together, down to Mexico and returning, sometimes both of them in the same vehicle or sometimes one of them would cross back in a vehicle and the other would cross back on foot.

Mr. Mora did provide monetary funds to Mr. Sevilla at times, but Mr. Sevilla was also with Mr. Mora in Mexico when they met with, presumably, cartel members who gave them funds to make these purchases. There were numerous purchases, and, again, they were acting together. Mr. Mora was not giving him -- giving Mr. Sevilla specific instructions. They were both receiving information and instructions from Mexico.

The text messages or WhatsApp messages between them show that they referred to each other as "primo" or "cuz." They were friends, and they were both acting in conjunction to commit this offense. There was no management responsibility. Had that been the case, Mr. Mora would not be himself going into these gun stores and buying and purchasing the guns or

taking them and transporting them down to Mexico. He would have been giving direction to somebody else to do that. But he was doing it himself, as well as Mr. Sevilla.

Mr. Sevilla's roommate, Mr. Najara, was involved because of Mr. Sevilla, and Mr. Sevilla was not only participating in the purchasing, in the transporting of the weapons to Mexico, but he was also running a drug business. He was caught with Fentanyl and a safe, along with firearms, and he's charged separately for that.

But the messages between the two do not show that Mr. Mora was acting in any capacity as leader or organizer. They were both involved on the same level. They were both acting as purchasers and transporters of these weapons down to Mexico. So I would ask the Court to find that that two-level enhancement is not appropriate in this case.

THE COURT: Thank you, Ms. Vietor.

Ms. Tsethlikai?

MS. TSETHLIKAI: Your Honor, the defendant clearly was the leader in this case. And while Sevilla gave some self-serving statements, they were not solely self-serving. In fact, they were very incriminatory, and his situation is not going to be good for him either, especially with the drugs and the firearms.

But Sevilla admitted his own involvement. He admitted that the defendant paid him -- so Mora paid Sevilla $100 per

firearm, and you compare that to the defendant's own statement of earning $800 to $1,000 each time he straw purchased. So the amount and the disparity in amounts clearly show that Mr. Mora was the leader and organizer in this case and that he was keeping most of the money, compared to the $100 that he was paying both Sevilla and Najara when they were purchasing firearms at Mr. Mora's direction.

The defendant, Mr. Mora, handled the actual transfer of the firearms, the magazines, and the ammunition to the cartel members. If you look at the defendant's crossings, which we had given the Court in attachment A, I think, to the leader/organization, you look at this, and you can see it's Mora, Mora, Mora, Mora. In my response, I misstated that it was only 28 crossings. It was actually 45 crossings that this defendant did, when you add 28 in the vehicle and 17 via the pedestrian lane, compared to Mr. Sevilla's total of eight crossings; that was four in a vehicle, usually with this defendant, and then four pedestrian crossings. So the person who was solely and mainly responsible for getting these firearms, ammunition and magazines into the hands of the cartel was this defendant, Mr. Mora.

The money transfers are from Mr. Mora to Mr. Sevilla, and they're over $1,000, $500 each time. Most of the time, it was all in cash. So it's very surprising that we actually had electronic evidence of the transfer of the money because

usually it was all done in cash. When they purchased the firearms, it was in cash. When they purchased the ammunition, it was in cash. Everything was in cash, and the cash was received and handled by Mr. Mora.

When you look at the fact that both Sevilla and Najara are explaining the same situation about how it's Mora who's telling them which firearms to purchase; it's Mora who's either getting it in the parking lot where the gun purchase was made or getting it at a different place; and it's Mora who's then paying them for each of these straw purchases.

The case law is also very clear. All we need is a single incident of a person acting under a defendant's direction to support the two-level enhancement. And that's a Ninth Circuit case from 2000 in United States versus Maldonado, and that's at 215 F.3d 1046.

We have here way more than just one incident. We have multiple incidents where this defendant truly is the leader and the organizer. He's the one who's getting people to purchase firearms for him. And really, when it comes right down here, it's Mora, Sevilla, Najara; you just kind of go down. Whether or not Sevilla recruited Najara, it still doesn't take away from the fact that it still all comes back up to Mora.

THE COURT: Ms. Tsethlikai, "leader/organizer" has some definitions under the case law; "manager/supervisor" has other ones. I believe under either manager/supervisor or under

leader/organizer, the two-level enhancement would still apply.

Do you disagree?

MS. TSETHLIKAI: No, I do not.

THE COURT: I don't know that I'd find leader and organizer, but I think your argument is better taken as to manager/supervisor, given the liberal definitions of those under the guidelines. But go ahead.

MS. TSETHLIKAI: With that, Your Honor, we would submit. We believe that the evidence is more than sufficient to support the two-level enhancement at this time.

THE COURT: Thank you.

Like I said, the Court doesn't find the defendant was a leader or organizer, as those terms are defined under the case law and under the guidelines. And although the defendant was not giving the co-defendant specific instructions, there were certainly sufficient instructions given that, under the terms of manager and supervisor as defined liberally under the United States Sentencing Guideline 3B1.1, the defendant's relevant conduct/activities, including providing $100 both to Sevilla and Najara to purchase guns and munitions on his behalf and directing them as to what firearms to purchase, and it was the defendant who principally had the contacts in Mexico and sold the guns to the folks in Mexico, earning between $800 and $1,000 per sale.

The Court finds that those are sufficient, along with the

other information pointed out by Ms. Tsethlikai, to categorize the defendant as a manager or supervisor within these facts, and, therefore, the objection is denied.

With that, Ms. Vietor, then, I'm going to go back to you: Do you believe that your client understands the presentence report and its recommendations?

MS. VIETOR: Yes, I do, Your Honor.

THE COURT: Mr. Mora, in reviewing the presentence report with your attorney, did she answer any questions that you may have had?

THE DEFENDANT: Yes, Your Honor, she did.

THE COURT: And are you satisfied with the services that Ms. Vietor has provided you in this matter?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you believe that you understand the presentence report and its recommendations?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Based upon your plea of guilty to the charges, in count 1, conspiracy to smuggle goods from the U.S., a class D felony; count 2, smuggling goods from the U.S., a class C felony; and count 3, false statements in the acquisition of a firearm, a class C felony, the Court accepts your plea. It is, therefore, the judgment of the Court that you are guilty of those offenses.

Based on the presentence report, the Court finds the

guidelines provide for a sentencing range of 87 to 108 months. And I think -- yes, on all three counts, based upon an offense level of 29 and a criminal history category of I.

Other than, Ms. Vietor, the objections that you posed and that I've already ruled on, are there any other objections to the presentence report?

MS. VIETOR: Your Honor, my only other objection will relate to the standard conditions of supervised release. I don't know if you want to hear from me later on that?

THE COURT: Okay. What is the objection to the standard conditions of supervised release?

MS. VIETOR: I'm going to approach.

THE COURT: All right.

MS. VIETOR: Your Honor, probation sets out that the standard conditions, as listed in General Order 17-18, would apply in this case. There is one standard condition; it's the notification of risk requirement. It reads: "If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk."

Your Honor, just for purposes of preserving this issue for appeal, I would object to that standard condition of supervised

release. I believe that the Court should have to decide if any risk exists and to give probation some sort of guidance on that issue. I don't even know that this applies in this case, but we do object to that standard condition.

THE COURT: Thank you. So noted.

Ms. Tsethlikai, any response?

MS. TSETHLIKAI: Your Honor, since it's not a -- it's only as probation deals with the defendant and then determines whether or not the defendant is displaying characteristics which show that he's becoming either a danger to himself or to others, I think probation would be at the best -- it's discretionary, and it's also based on the facts at the time. It's not just a mandatory "you must tell everybody you're a risk." So we would just submit on that, that they would have to have a basis for making that assessment, and I'm sure that they don't give that out lightly.

THE COURT: Thank you.

Court adopts the presentence report and makes it part of the record.

There is no plea agreement in this case.

The Court has reviewed the presentence report, the defendant's sentencing memorandum, a letter from Mr. Mora, which I appreciated, and several letters from the defendant's family, some of which I note are here in the courtroom today.

Welcome.

With that, Ms. Vietor, anything additional you'd like to argue or present to the Court?

MS. VIETOR: Yes, Your Honor.

Your Honor, this case is obviously a very serious one, and I think that Mr. Mora appreciates that. He understands that he became involved in a very serious offense. He takes full responsibility for that. Had it not been for the pandemic, he would have entered a plea much earlier, but he did plead guilty in September when things started to open up a bit for the courts.

Mr. Mora became involved in this offense solely for financial reasons. He had been working at Midas, working on vehicles, and then prior to his arrest, he was working at a Circle K as a cash register [sic]. He has a young daughter who he helps support, and he helps support his parents. His mother, as I mentioned, is in the courtroom today; his father, who had a stroke, I believe, back in 2016 and is not able to work as much as he used to. So Mr. Mora felt pressure, the economic pressure, to do something to try to help his family, and, unfortunately, he made this very bad decision to become involved in this type of offense.

Your Honor, Mr. Mora grew up on the south side of Tucson along with his sister, Jocelyn, who's here in the courtroom as well. She describes in one of her letters how gangs were prevalent, drug dealers on the corners of the streets, how they

would actively try to recruit herself and Mr. Mora. But Mr. Mora tried to stay away from that. He became involved in football, in school. He was trying to lead -- go down the right path and lead a law-abiding life. But, again, the pressures, the economic pressure he found himself in, as well as maybe certain bad influences that he became acquainted with in Mexico, led him to become involved in this offense.

Mr. Mora's mother, who's here in the courtroom, has been suffering from various health problems. Her kidneys are only working eight to 13 percent. It's my understanding she's going to be placed on dialysis. She has been in and out of the hospital during this whole time that Mr. Mora has been in custody.

Another factor I would ask the Court to consider is that during this whole time he's been in custody, he has not been able to have any family visits because of COVID. It has been harder to be in custody in the sense that Mr. Mora and all other defendants have been in and out of quarantine regularly. It's a factor that I hope the Court considers. It's even been a factor in my representation of him because I have not been able to see him as much as I had liked in person. I did get a chance to visit with him in person a few times before the pandemic started, but, also, phone calls with him were often canceled because of defendants going in and out of quarantine.

Mr. Mora would really like the opportunity to be back home

and be able to see his mother and father before things are too late for him. He greatly asks the Court to consider that he -- he knows he did wrong, and he plans to come out of this and go down the right path.

He would like the Court to consider recommending the 500-hour RDAP program. He indicates to me that drugs were a factor. He was using drugs every so often while he was involved in these type of offenses, and it was a contributing factor to his decision-making. So I would ask the Court to consider recommending the 500-hour RDAP program and also recommending a facility here in Arizona so that, hopefully, soon his family can visit.

Thank you.

THE COURT: Thank you.

Mr. Mora, anything you'd like to say regarding sentencing?

THE DEFENDANT: Yes, Your Honor.

First of all, I would like to apologize to this court. I would like to apologize to my country and to my family for my actions that have landed me today here.

My motives -- Your Honor, I was going through a lot of hardships. Not only emotionally, I was going through physically and also financial hardships. The reason why I stopped working on cars, Your Honor, is I was having a lot of pain in my hands. We have a lot of history of arthritis in my family. My sister was diagnosed with arthritis at the age of

ten. And that's one of the reasons I started using drugs, Your Honor. I started self-medicating with marijuana, and that would help my pain.

Also, Your Honor, my background is -- my mom and dad, they've always worked very hard for us. They've always worked very hard to keep us, like, out of the streets, always told us to go to school, lead a straight and narrow path. Your Honor, I used to see my dad wake up every day at 3 in the morning, always used to give me good advice.

Being in here, Your Honor, I've reflected a lot. I've done a lot of reflecting on my life. And, Your Honor, I just want to put all of this behind me. I want to get back to my family. I know I might not be able to see my mom again. My daughter is actually needing me outside, too, Your Honor.

Sorry, Your Honor.

I just -- before I got arrested, Your Honor, I was trying to walk away from all this, and I was -- I was trying to work again. I remembered what my dad told me when I was a kid. When I was doing this, Your Honor, I was very scared. I was scared not only for my life but for my family's life. So that's why I decided to walk away, Your Honor. I walked away from it, and, honestly, I tried to look for a job and I was trying to lead a straight and narrow path again, Your Honor. But my -- what I did got me in here, I do apologize for that, Your Honor.

THE COURT: Thank you, Mr. Mora.

Ms. Tsethlikai, anything additional from the government?

MS. TSETHLIKAI: Yes, Your Honor.

Your Honor, when it really comes right down to it, this defendant fortified the army of a Mexican drug cartel. And it just cannot be ignored that the deadly and dangerous consequences of the defendant's actions are going to have an impact on Mexico for years to come. They're not going to end today when this defendant gets his final sentence. It's going to continue for a very long time.

We've only recovered four of the firearms at this time. We still have 29 firearms out there. We still have 760 30-round magazines out there. If you were to fully use all those magazines at one time, fully loaded, that's 22,800 bullets. This defendant actually bought 25,000 rounds of ammunition. You consider those consequences on these poor people in Mexico.

You have 45 crossings by this defendant. You have six pages of actions by this defendant of purchasing, crossing, purchasing, crossing, purchasing, crossing. This defendant -- I'm amazed that it took us as long as it did to catch him with how many times he was going across the border and how many times he was bringing firearms, ammunition and different rounds of magazines with him.

You know, I listened to defense counsel talk about how he needs drug rehab. But you look at paragraph 64 on page 17 of

the PSR, and I'm going to quote directly what it says: "The defendant said he is not interested in treatment and denied substances interfering with his life." That's what he said to probation. So using a 500-hour RDAP program to help the defendant get out sooner from a sentence that he has earned just does not make sense.

The defendant also benefits from the denial -- and the government's failure to object -- to the four-level enhancement that the firearms were being trafficked. The defendant definitely knew that these were going to the drug cartel members who were going to use them to promote, protect, and further their drug trafficking operations. This was clearly trafficking of firearms and munitions in Mexico.

Your Honor, in looking also, we would ask that the Court sign the final order of forfeiture. The objection -- I don't know if you want us to address that, but we believe there is sufficient evidence that that final order of forfeiture should be signed at this time.

THE COURT: I thought the objection had been cleared up on the forfeiture.

MS. VIETOR: No, Your Honor. There is still an objection.

MS. TSETHLIKAI: You never ruled.

THE COURT: I thought it had been ruled on.

MS. VIETOR: And I just have a short statement to make

on that.

MS. TSETHLIKAI: If you did, Your Honor, I missed it. Did you get the order?

MS. VIETOR: No.

THE COURT: Well, this case wasn't mine originally, so when I got the -- when I looked at it before, I noticed there was an objection. Nobody set it for a hearing and nobody raised anything, and then I got the final order for forfeiture. Ms. Tsethlikai, why don't you finish your comments and then I'll hear from Ms. Vietor on that.

MS. TSETHLIKAI: Your Honor, so do you want me to address forfeiture, or do you want me to wait until she addresses it?

THE COURT: She filed the objection. Why don't you wait. That's probably the proper way to do it.

MS. TSETHLIKAI: Your Honor, this is like -- this case has always bothered me in the sense -- and I've done a lot of these types of cases. But the number of magazines, you just -- you just cannot ignore how powerful those magazines are, how quickly they unload, how quickly you've got 30 rounds going out during a firing spree. This truly -- the actions of this defendant clearly show and demonstrate that he was definitely arming a Mexican drug cartel.

And what's been interesting about this also, in that I've been seeing a pattern lately, is this defendant is a

naturalized United States citizen. His callous disregard to the effects and deadly consequences to the people of Mexico, in bringing all those firearms -- and when we're talking about firearms, the majority of these are the 7.62x39 caliber -- those are AK-47 type weapons -- and then the .223s, which are AR-15s. These are the weapons of choice for drug cartels. These were -- the 760 magazines were specifically for the AR-15s and the AK-47 type weapons. This is purely just trafficking.

And I -- we are lucky that we do not know what's going on in Mexico. We are lucky that we don't have to hear all those bullets being fired every day. We are lucky that our neighborhoods have not been impacted at all.

Many people grew up on the south side of Tucson. I'm one of them. So you cannot just say that that's the reason why you follow this type of actions. I graduated from Sunnyside. So there's just no excuse for that.

People make choices. This defendant made a choice. He made a choice to make easy money. He was getting $800 to $1,000 each time he straw purchased. It was easy money for him. He was easily crossing. And he was easily delivering those weapons and munitions to the drug cartels.

And I would ask that the sentence be at least 87 months, with the 60 months concurrent on the other counts because that's the highest you can go for those counts because that's

the statutory maximum. But really he should be looking at the ten years because the effects of what he did and the effects of these firearms and munitions in Mexico could even go beyond the ten years.

Thank you.

THE COURT: Thank you.

Ms. Vietor, I'll hear from you, then, on your objection to the forfeiture.

MS. VIETOR: Thank you, Your Honor. I'm going to keep this brief.

I mainly want to just reassert the arguments that are set out in my objection, which is document 55. We object to the substitute order of forfeiture based on the statutory construction of the civil and criminal forfeiture statutes and the bridging statute, as well as due process and the Eighth Amendment and based on fairness.

THE COURT: Based on what? I'm sorry.

MS. VIETOR: Fairness.

THE COURT: Oh, fairness. I'm sorry. Okay. Thank you.

MS. VIETOR: Essentially, the argument is that Mr. Mora was an intermediary. He was obtaining money from the cartels to purchase the weapons and delivering those weapons to the cartel. He was not using his own money. So we believe that it would be essentially unfair to ask that he be required

to pay the $31,000 that was not even his money.

And we understand that under a current Ninth Circuit law, United States versus Valdez, the law is not in our favor. I am making this argument to preserve the issue for an appeal. In United States versus Valdez, the Supreme Court indicated that there was an interest in this case, and then it was relisted for a conference in March of 2020 when the pandemic basically shut things down. So I would just reassert my arguments that I have set out in the written objection.

THE COURT: Thank you.

MS. VIETOR: Thank you.

THE COURT: The Court finds that the current case law is controlling. The objection to the forfeiture is denied.

Ms. Tsethlikai, I didn't give you a chance to respond, but I didn't think it was necessary.

MS. TSETHLIKAI: Thank you, Your Honor.

THE COURT: Mr. Mora, while I can appreciate you want to put this behind you, the comments of Ms. Tsethlikai are well taken. You basically funneled a lot of firepower into Mexico, which clearly is used for nothing but the cartels to kill people who they decide they want to kill for whatever reason they decide they want to kill. And I don't know whether you're ignorant or you just don't want to deal with the situation, but the bottom line is, you can read almost any day in the newspapers as to what the cartels are doing down there to

people along the border, using this type of ammunition and these types of munitions.

But the Court does believe or finds you have good family support and family responsibilities and takes into consideration your medical issues.

But weighing all of those factors and having considered the other 3553(a) factors, the presentence report and the statements by the parties, it is the order of the Court the defendant is committed to the Bureau of Prisons for 60 months on count 1, with credit for time served, followed by three years of supervised release.

As to count 2, it is the order of the Court the defendant is committed to the Bureau of Prisons for 60 months, again with credit for time served, followed by three years of supervised release.

And on count 3, 60 months, with credit for time served, followed by three years of supervised release.

Each count is to run concurrent with each other, both as to the sentence and as to the supervised release time.

Court finds the defendant does not have an ability to pay a fine, and the fine is waived.

The Court imposes a $300 mandatory assessment which shall be paid at the rate of $25 per quarter per the prison inmates financial responsibility program.

The Court finds that forfeiture was part of the case, and,

having denied the defendant's objection, the Court signs the order of forfeiture in court and will file it.

The Court finds that supervised release will provide an added measure of deterrence and protection to the community, based on the facts and circumstances of this case. During the term of supervised release, defendant is required to comply with the standard conditions under General Order 17-18 and all special conditions set forth in the presentence report.

Mr. Mora, do you understand the sentence I have imposed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I gave you a break and didn't sentence you to the 87 months, although -- I've got to be honest -- I highly considered it. But you have a total of 60 months on all three counts, taking into consideration the other items that I mentioned. But, sir, I just don't think you fully understand the gravity of what you have done. And hopefully by the time you get out, you will fully appreciate that and, when you do get out, that you'll abide by all of your terms and conditions under the supervised release. Because if you don't, you'll be back before me and you'll find yourself back where you currently are.

Is that understood?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you believe the Court has erred in its findings or sentence, you have the right to appeal. To

preserve that right, you must file a notice of appeal within 14 days of today's date. Counsel would be appointed to represent you during the appeal.

Do you understand these rights?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Ms. Vietor, anything additional?

MS. VIETOR: Just we would ask for the recommendation for a BOP facility here and if the Court will consider the 500-hour drug program.

THE COURT: The Court is not going to consider the 500-hour program.

The Court will recommend that Mr. Mora be housed in a facility --

You want southern Arizona or just Arizona?

MS. VIETOR: Southern Arizona.

THE COURT: -- southern Arizona, to facilitate family visitation.

Ms. Tsethlikai, anything additional?

MS. TSETHLIKAI: No, Your Honor. Thank you.

THE COURT: Mr. Mora, best of luck to you, sir. Good luck.

We stand at recess.

**C E R T I F I C A T E**

I, Anni Bryan, Federal Official Realtime Reporter, in and for the United States District Court for the District of Arizona, do hereby certify that, pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 15th day of June 2021.

_____/s/Anni Bryan_____
Anni Bryan, RDR, CRR
Official Court Reporter